**BURSOR & FISHER, P.A.**
Yitzchak Kopel (BBO # 716245)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| RUBEN JUAREZ, SEAN MARIN, BRIAN SHULTZ, and BENEDICT IACOVETTI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>PEGASYSTEMS INC.,<br><br>Defendant. | Case No. 1:26-cv-14506<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiffs Ruben Juarez, Sean Marin, Brian Shultz, and Benedict Iacovetti ("Plaintiffs"), individually and on behalf of all others similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF ACTION

1. Defendant Pegasystems Inc. ("Defendant" or "Pega") has developed and provides a customer service product called Pega Voice AI as a software-as-a-service.

2. Pega Voice AI is employed by numerous entities, including U.S. Bank National Association ("U.S. Bank") to monitor voice and text-based interactions.

3. U.S. Bank contracted with Defendant and its Pega Voice AI service to respond to customers who call from California, Massachusetts, Pennsylvania, and across the nation to, among other things, receive support through these channels.

4. By virtue of providing the Pega Voice AI service, however, Defendant also records, accesses, reads, and learns the contents of conversations between Californians, Massachusettsans, and Pennsylvanians on the one hand, and U.S. Bank customer service representatives, on the other. And, crucially, neither Defendant nor U.S. Bank procure the prior consent, express or otherwise, of any

person who interacts with U.S. Bank's customer service agents, prior to Defendant recording, accessing, reading, and learning the contents of conversations between Californians, Massachusettsans, and Pennsylvanians on the one hand, and U.S. Bank's customer service representatives on the other.

5. Through its use of Pega Voice AI, Defendant has failed to comply with the California Invasion of Privacy Act ("CIPA") §§ 631 and 632, the Massachusetts Wiretapping Statute, Mass. Gen. Laws ch. 272, § 99, and the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa. Cons. Stat. § 5701, *et seq* ("WESCA").

6. Plaintiffs bring this action to prevent Defendant from further violating the privacy rights of California, Massachusetts, and Pennsylvania residents, and to recover statutory damages for Defendant having recorded, accessed, read, and learned the contents of conversations between Californians, Massachusettsans, and Pennsylvanians on the one hand, and U.S. Bank, on the other, without procuring prior consent, in contravention of CIPA §§ 631 and 632, the Massachusetts Wiretapping Statute, and WESCA.

## PARTIES

7. Plaintiff Ruben Juarez resides in Whittier, California and has an intent to remain there, and is therefore a citizen of California. Mr. Juarez, an account holder with U.S. Bank, was in California when he spoke to a representative from U.S. Bank

over the phone from his home on multiple occasions, including in or about January 2026.

8. Plaintiff Sean Marin resides in Rosamond, California and has an intent to remain there, and is therefore a citizen of California. Mr. Marin, an account holder with U.S. Bank, was in California when he spoke to a representative from U.S. Bank over the phone from his home on multiple occasions, including in or about December 2025.

9. Plaintiff Brian Shultz resides in Grafton, Massachusetts and has an intent to remain there, and is therefore a citizen of Massachusetts. Mr. Shultz, an account holder with U.S. Bank, was in Massachusetts when he spoke to a representative from U.S. Bank over the phone from his home on multiple occasions, including in or about June, 2026.

10. Plaintiff Benedict Iacovetti resides in Fort Washington, Pennsylvania and has an intent to remain there, and is therefore a citizen of Pennsylvania. Mr. Iacovetti, a business account holder with U.S. Bank, was in Pennsylvania when he spoke to a representative from U.S. Bank over the phone from his home on multiple occasions, including in or about March 2026 and August 2026.

11. Defendant Pegasystems Inc. is a Massachusetts corporation, with its principal place of business located at 225 Wyman Street, Waltham, Massachusetts 02451. Pega does business throughout California and much of the United States.

Pega provides a customer contact and support solution called "Pega Voice AI" which is at issue here and described more fully below.

12. At all relevant times, U.S. Bank contracted with Pega and its Pega Voice AI service.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

14. This Court has personal jurisdiction over Defendant because Defendant is incorporated in and has its principal place of business in Massachusetts.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

## FACTUAL BACKGROUND

### I. THE CALIFORNIA INVASION OF PRIVACY ACT

16. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of

eavesdropping upon private communications ... has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

17. As the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

18. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from (i) "intentionally tap[ping], or mak[ing] any unauthorized connection ... with any telegraph or telephone wire," (ii) "willfully and without the consent of all parties to the communication ... read[ing], or attempt[ing] to read, or to learn the contents or meaning of any ... communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or (iii) "us[ing], or attempt[ing] to use ... any

information so obtained." CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping.

19. Individuals may bring an action against the violator of CIPA § 631 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1).

## II. DEFENDANT VIOLATES THE CALIFORNIA INVASION OF PRIVACY ACT

20. Pega Voice AI is an artificial intelligence tool that "assists [customer service representatives] during live phone interactions by suggesting actions based on real-time analysis of the conversation," including "case suggestions," "knowledge suggestions," "script adherence reminders," and "hands-free form autofill."[1]

21. Real-time "speech-to-text transcription and natural language processing (NLP) power Voice AI," which "uses proprietary speech-to-text transcription and natural language processing capabilities to analyze conversations and provide contextually relevant, real-time suggestions" to agents.[2]

---

[1] PEGA VOICE AI INTRODUCTION, https://academy.pega.com/module/pega-voice-ai-introduction/v2; PEGA VOICE AI, https://academy.pega.com/mission/pega-voice-ai/v4

[2] PEGA VOICE AI https://academy.pega.com/mission/pega-voice-ai/v1; VOICE AI FOR PEGA SALES AUTOMATION, https://academy.pega.com/topic/voice-ai-pega-sales-automation/v1

22. In a typical deployment, when a CSR receives or starts a call, "Voice AI Desktop picks up audio streams and routes them to Audio Router, which then sends the audio to Speech Service for real-time transcription." Speech Service "receives the two audio streams … transcribes the audio into text, and returns the transcripts … in real time," and the transcripts are then processed by Defendant's NLP and event-suggestion components.[3]

23. Through this architecture, Pega Voice AI continuously receives and processes the contents of both sides of the live telephone conversation between the consumer and the human agent, in order to generate contextually relevant, real-time suggestions and other AI-driven outputs.[4]

24. Defendant states that its Voice AI solution for service and sales "listens to the customer and automatically prompts next steps for the agent based on contextual knowledge," including "knowledge suggestions [that] put relevant content and answers at the representative's fingertips," "hands-free form autofill that

---

[3] VOICE AI ARCHITECTURE, https://academy.pega.com/topic/voice-ai-architecture/v1

[4] PEGA VOICE AI, https://academy.pega.com/mission/pega-voice-ai/v4; PEGA VOICE AI INTRODUCTION, https://academy.pega.com/module/pega-voice-ai-introduction/v2; VOICE AI ARCHITECTURE, https://academy.pega.com/topic/voice-ai-architecture/v1

uses entities detected from the voice stream," and "interaction summaries" that eliminate manual note-taking.[5]

25. Defendant further touts that Voice AI "analyze[s] live customer service conversations in real time to help agents quickly resolve service requests," providing "hands-free data entry" by "listen[ing] to live conversations and automatically enter[ing] data into the system," "auto-launch[ing] workflows as soon as customer inquiries come through," surfacing "contextual knowledge," and showing agents "real-time script guidance during live phone calls."[6]

26. Defendant markets Pega Voice AI as an "intelligent co-pilot" that continuously monitors conversations, auto-fills forms based on the conversation, and

[5] New Pega Voice AI and Messaging AI Solutions Give Service Agents an Intelligent Copilot for Better, Faster Service, https://www.prnewswire.com/news-releases/new-pega-voice-ai-and-messaging-ai-solutions-give-service-agents-an-intelligent-copilot-for-better-faster-service-301477117.html; Pega Voice AI Demo, https://www.pega.com/insights/resources/pega-voice-ai-demo; Pega Voice AI Introduction, https://academy.pega.com/module/pega-voice-ai-introduction/v2

[6] Launches New 'Intelligent Copilot' AI Messaging Solutions for Agents, https://iireporter.com/pega-launches-new-intelligent-copilot-ai-messaging-solutions-for-agents/; New Pega Voice AI and Messaging AI Solutions Give Service Agents an Intelligent Copilot for Better, Faster Service, https://www.prnewswire.com/news-releases/new-pega-voice-ai-and-messaging-ai-solutions-give-service-agents-an-intelligent-copilot-for-better-faster-service-301477117.html

generates "interaction summaries" and "conversational analytics with coaching insights and compliance monitoring" after and during calls.[7]

27. U.S. Bank has implemented Pega Voice AI in its contact centers. Defendant showcases U.S. Bank as a customer that "used Pega Voice AI … to transform their approach by providing intelligent, real-time assistance" in its customer service operations, including "case suggestions," "auto form fill that captures customer information in real time," "knowledge suggestions," "interaction summaries," and "conversational analytics with coaching insights and compliance monitoring."[8]

28. Defendant explains that, at U.S. Bank, the Voice AI solution "provid[es] intelligent, real-time assistance that augments rather than replaces

---

[7] PEGA VOICE AI DEMO, https://www.pega.com/insights/resources/pega-voice-ai-demo; US BANK TRANSFORMS THE AGENT EXPERIENCE WITH VOICE AI - PEGA, https://www.pega.com/customers/us-bank-customer-service; NEW PEGA VOICE AI AND MESSAGING AI SOLUTIONS GIVE SERVICE AGENTS AN INTELLIGENT COPILOT FOR BETTER, FASTER SERVICE, https://www.prnewswire.com/news-releases/new-pega-voice-ai-and-messaging-ai-solutions-give-service-agents-an-intelligent-copilot-for-better-faster-service-301477117.html

[8] US BANK TRANSFORMS THE AGENT EXPERIENCE WITH VOICE AI, https://www.pega.com/customers/us-bank-customer-service; PEGAWORLD 2025: A FIRESIDE CHAT - U.S. BANK'S OPERATIONS TRANSFORMATION JOURNEY: CUSTOMER SERVICE WITH PEGA VOICE AI, https://www.pega.com/insights/resources/pegaworld-2025-fireside-chat-us-banks-operations-transformation-journey-customer

human capabilities," and that "real-time AI decisioning" is used to present opportunities and guidance at the right time during live interactions.[9]

29. In deploying Pega Voice AI for U.S. Bank, Defendant configures its Voice AI architecture so that audio streams from U.S. Bank customer calls are routed to Defendant's Speech Service in Pega Cloud for real-time transcription and analysis, and transcripts are continuously polled and processed by Pega Server components (including Transcript Processor, Pega NLP, and Event Suggestion) to generate real-time suggestions and post-call outputs.[10]

30. Critically, once a consumer is connected to a human U.S. Bank customer service representative, the consumer reasonably believes that the conversation is only between themselves and that human agent. They do not expect, nor do they have any reason to suspect, that a third-party vendor such as Defendant is simultaneously receiving, transcribing, and analyzing the contents of their live telephone communications.

---

[9] PEGA VOICE AI DEMO, https://www.pega.com/insights/resources/pega-voice-ai-demo; US BANK TRANSFORMS THE AGENT EXPERIENCE WITH VOICE AI, https://www.pega.com/customers/us-bank-customer-service

[10] PEGA VOICE AI ARCHITECTURE, https://academy.pega.com/topic/voice-ai-architecture/v1; US BANK TRANSFORMS THE AGENT EXPERIENCE WITH VOICE AI, https://www.pega.com/customers/us-bank-customer-service

31. Yet, contrary to those expectations, Defendant, through Pega Voice AI, continuously "listens to the customer," captures both sides of the call, transcribes the audio in real time, and uses NLP and other AI components to analyze the conversation and generate suggestions, summaries, and other outputs for U.S. Bank's agents and managers.[11]

32. Pega's Voice AI solution also enables U.S. Bank agents and managers to "view and download live transcripts," and to rely on AI-generated summaries and analytics that are derived from Defendant's recording and processing of customers' telephone communications.[12]

33. Defendant profits from its provision of Pega Voice AI and related cloud services to U.S. Bank, including by selling licenses and cloud capacity for

---

[11] VOICE AI FOR PEGA SALES AUTOMATION, https://academy.pega.com/topic/voice-ai-pega-sales-automation/v1; PEGA VOICE AI INTRODUCTION, https://academy.pega.com/module/pega-voice-ai-introduction/v2; NEW PEGA VOICE AI AND MESSAGING AI SOLUTIONS GIVE SERVICE AGENTS AN INTELLIGENT COPILOT FOR BETTER, FASTER SERVICE, https://www.prnewswire.com/news-releases/new-pega-voice-ai-and-messaging-ai-solutions-give-service-agents-an-intelligent-copilot-for-better-faster-service-301477117.html; VOICE AI ARCHITECTURE, https://academy.pega.com/topic/voice-ai-architecture/v1; PEGA VOICE AI DEMO, https://www.pega.com/insights/resources/pega-voice-ai-demo

[12] CONFIGURING TRANSCRIPT DISPLAY AND DOWNLOAD, https://docs.pega.com/bundle/customer-service/page/customer-service/constellation-implementation/voice-ai/configure-transcript-display-download.html; US BANK TRANSFORMS THE AGENT EXPERIENCE WITH VOICE AI, https://www.pega.com/customers/us-bank-customer-service; PEGA VOICE AI DEMO, https://www.pega.com/insights/resources/pega-voice-ai-demo

Speech Service, Audio Router, and other Voice AI components that process and store call audio and transcripts in Defendant's environment.[13]

34. When Pega Voice AI and its features are used on a telephone conversation, it is not like a simple tape recorder or a passive "tool" used by one party to record the other. Instead, Pega Voice AI involves Defendant, a separate and distinct third-party entity from the parties to the conversation, receiving, recording, and analyzing the contents of the conversation to which it is not a party, including by running those contents through Defendant's own speech-to-text, NLP, and decisioning systems hosted in Pega Cloud.[14]

35. Defendant has the capability to use the contents of the conversations it collects through Pega Voice AI to train and improve its AI/ML models, including by allowing clients to "train the AI models to improve accuracy and efficiency of

[13] US BANK TRANSFORMS THE AGENT EXPERIENCE WITH VOICE AI, https://www.pega.com/customers/us-bank-customer-service; VOICE AI ARCHITECTURE, https://academy.pega.com/topic/voice-ai-architecture/v1

[14] PEGA VOICE AI, https://academy.pega.com/mission/pega-voice-ai/v1; VOICE AI FOR PEGA SALES AUTOMATION, https://academy.pega.com/topic/voice-ai-pega-sales-automation/v1; PEGA VOICE AI ARCHITECTURE, https://academy.pega.com/topic/voice-ai-architecture/v1

results" in Voice AI channels, and by relying on Voice AI data to refine script-adherence, entity-detection, and decisioning logic.[15]

36. During consumers' calls to U.S. Bank's contact centers, Defendant and U.S. Bank fail to inform consumers, prior to any recording: (i) that Defendant, a third party, is listening to and receiving their communications in real time, (ii) that Defendant, a third party, is tapping or otherwise making an unauthorized connection with the consumer's telephone conversation using Pega Voice AI, and (iii) that the content of consumers' confidential communications with U.S. Bank is being recorded, intercepted, and analyzed by Defendant, a third party, using Pega Voice AI.

37. The Pega Voice AI service and its associated virtual/AI assistant capabilities are designed to record and analyze real-time phone conversations. As such, when Defendant provided the Pega Voice AI service and its features to U.S. Bank, Defendant understood and therefore intended that the communications of customers who called into U.S. Bank's contact centers would be recorded, transcribed, and analyzed.

[15] PEGA VOICE AI, https://academy.pega.com/mission/pega-voice-ai/v4; PEGA VOICE AI, https://academy.pega.com/mission/pega-voice-ai/v1; VOICE AI ARCHITECTURE, https://academy.pega.com/topic/voice-ai-architecture/v1

38. At times, Defendant listens to, records, and monitors conversations that take place during customer calls to U.S. Bank's contact centers regardless of whether these conversations take place inside the customer's residence, workplace, or place of business.

39. Therefore, Defendant's conduct violates the rights of Californians set forth in CIPA §§ 631 and 632.

## III. THE PENNSYLVANIA WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT

40. The Pennsylvania Wiretapping and Electronic Surveillance Control Act (the "Pennsylvania Wiretapping Act") prohibits: (a) the interception or procurement of another to intercept any wire, electronic or oral communication; (b) the intentional disclosure of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and (c) the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

41. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of the Pennsylvania Wiretapping Act is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day

for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

42. Under the Pennsylvania Wiretapping Act, "intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." 18 Pa. Cons. Stat. § 5702.

43. Under the Pennsylvania Wiretapping Act, "contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication." 18 Pa. Cons. Stat. § 5702.

44. Under the Pennsylvania Wiretapping Act, "person" is defined as "any individual, partnership, association, joint stock company, trust or corporation." 18 Pa. Cons. Stat. § 5702.

45. Under the Pennsylvania Wiretapping Act, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system." 18 Pa. Cons. Stat. § 5702.

46. Pursuant to the Pennsylvania Wiretapping Act, the Commonwealth and any of its officers, officials or employees who may be shielded from liability under the Pennsylvania Wiretapping Act by the doctrine of sovereign immunity waive such immunity. 18 Pa. Cons. Stat. § 5725(b)

## IV. PLAINTIFFS' EXPERIENCE

### A. Plaintiff Juarez

47. Plaintiff Juarez called U.S. Bank's customer service line on multiple occasions, including in or about January 2026 from his home.

48. Plaintiff Juarez reasonably expected his conversations with U.S. Bank's customer service to be only between himself and U.S. Bank.

49. During the call with U.S. Bank, Plaintiff Juarez interacted with a human customer service agent. During Plaintiff Juarez's call with the human agent, he reasonably expected the conversation would be only between himself and the U.S. Bank human customer service agent. This is due in part to the fact he discussed a new business account that had to be activated and provided personal information such as his home address his account number and his date of birth to receive assistance. He did not expect or have any reason to expect that Defendant, a third party, was listening in on his conversations with the U.S. Bank human customer service agent.

50. Nonetheless, Defendant, through Pega Voice AI, eavesdropped on Plaintiff Juarez's entire conversations with the U.S. Bank human customer service agent. Specifically, Pega Voice AI monitored the conversation between Plaintiff Juarez and U.S. Bank, and Defendant, through Pega Voice transcribed Plaintiff Juarez's conversations in real time, analyzed the context of Plaintiff Juarez's conversations with U.S. Bank using natural language processing, and generated suggestions to the U.S. Bank agent Plaintiff Juarez was communicating with.

51. Through the aforementioned process, Defendant read and learned, in real time, the contents of Plaintiff Juarez's conversations with U.S. Bank.

52. Neither U.S. Bank nor Defendant procured Plaintiff Juarez's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Juarez's conversations with U.S. Bank. Nor did Plaintiff Juarez give his prior consent, express or otherwise, to Defendant or U.S. Bank to allow Defendant to wiretap his communications with U.S. Bank.

53. Plaintiff Juarez has, therefore, had his privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

**B. Plaintiff Marin**

54. Plaintiff Marin called U.S. Bank's customer service on multiple occasions, including in or about December 2025 from his home.

55. Plaintiff Marin reasonably expected his conversations with U.S Bank's customer service to be only between himself and U.S Bank.

56. During the 2025 call with U.S Bank, Plaintiff Marin interacted with a human customer service agent. When Plaintiff Marin spoke with the human agent, he reasonably expected the conversation would be only between himself and the U.S. Bank human customer service agent. This is due in part to the fact he discussed details regarding his account and provided personal information, including his home address and the last four digits of his debit card number. He did not expect or have any reason to expect that Defendant, a third party, was listening in on his conversations with the U.S. Bank human customer service agent.

57. Nonetheless, Defendant, through Pega Voice AI, eavesdropped on Plaintiff Marin's entire conversations with the U.S. Bank human customer service agent. Specifically, Pega Voice AI monitored the conversation between Plaintiff Marin and U.S. Bank, and Defendant, through Pega Voice AI and its features transcribed Plaintiff Marin's conversations in real time, analyzed the context of Plaintiff Marin's conversations with U.S. Bank using natural language processing, and generated suggestions to the U.S. Bank agent Plaintiff Marin was communicating with.

58. Through the aforementioned process, Defendant read and learned, in real time, the contents of Plaintiff Marin's conversations with U.S. Bank.

59. Neither U.S. Bank nor Defendant procured Plaintiff Marin's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Marin's conversations with U.S. Bank. Nor did Plaintiff Marin give his prior consent, express or otherwise, to Defendant or U.S. Bank to allow Defendant to wiretap his communications with U.S. Bank.

60. Plaintiff Marin has, therefore, had his privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of CIPA alleged herein.

**C. Plaintiff Shultz**

61. Plaintiff Shultz called U.S. Bank's customer service line on multiple occasions, including in or about June 2026 from his home.

62. Plaintiff Shultz reasonably expected his conversations with U.S. Bank's customer service to be only between himself and U.S. Bank.

63. During the call with U.S. Bank, Plaintiff Shultz interacted with a human customer service agent. During Plaintiff Shultz's call with the human agent, he reasonably expected the conversation would be only between himself and the U.S. Bank human customer service agent. This is due in part to the fact he discussed a new business account that had to be activated and provided personal information such as his home address his account number and his date of birth to receive assistance. He did not expect or have any reason to expect that Defendant, a third

party, was listening in on his conversations with the U.S. Bank human customer service agent.

64. Nonetheless, Defendant, through Pega Voice AI, eavesdropped on Plaintiff Shultz's entire conversations with the U.S. Bank human customer service agent. Specifically, Pega Voice AI monitored the conversation between Plaintiff Shultz and U.S. Bank, and Defendant, through Pega Voice transcribed Plaintiff Shultz's conversations in real time, analyzed the context of Plaintiff Shultz's conversations with U.S. Bank using natural language processing, and generated suggestions to the U.S. Bank agent Plaintiff Shultz was communicating with.

65. Through the aforementioned process, Defendant read and learned, in real time, the contents of Plaintiff Shultz's conversations with U.S. Bank.

66. Neither U.S. Bank nor Defendant procured Plaintiff Shultz's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Shultz's conversations with U.S. Bank. Nor did Plaintiff Shultz give his prior consent, express or otherwise, to Defendant or U.S. Bank to allow Defendant to wiretap his communications with U.S. Bank.

67. Plaintiff Shultz has, therefore, had his privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of the Massachusetts Wiretap Act alleged herein.

**D. Plaintiff Iacovetti**

68. Plaintiff Iacovetti called U.S. Bank's customer service line in or about March 2026 and August 2026 from his home and/or business in Pennsylvania.

69. Plaintiff Iacovetti reasonably expected his conversations with U.S. Bank's customer service to be only between himself and U.S. Bank.

70. During the call with U.S. Bank, Plaintiff Iacovetti interacted with a human customer service agent. During Plaintiff Iacovetti's calls with the human agent, he reasonably expected the conversation would be only between himself and the U.S. Bank human customer service agent. This is due in part to the fact he discussed his business accounts with U.S. Bank, including his account numbers, account names, account balances, and other account information. He also provided person information for identification purposes. He did not expect or have any reason to expect that Defendant, a third party, was listening in on his conversations with the U.S. Bank human customer service agent.

71. Nonetheless, Defendant, through Pega Voice AI, eavesdropped on Plaintiff Iacovetti's entire conversations with the U.S. Bank human customer service agent. Specifically, Pega Voice AI monitored the conversation between Plaintiff Iacovetti and U.S. Bank, and Defendant, through Pega Voice transcribed Plaintiff Iacovetti's conversations in real time, analyzed the context of Plaintiff Iacovetti's

conversations with U.S. Bank using natural language processing, and generated suggestions to the U.S. Bank agent Plaintiff Iacovetti was communicating with.

72. Through the aforementioned process, Defendant read and learned, in real time, the contents of Plaintiff Iacovetti's conversations with U.S. Bank.

73. Neither U.S. Bank nor Defendant procured Plaintiff Iacovetti's prior consent, express or otherwise, to have Defendant eavesdrop on Plaintiff Iacovetti's conversations with U.S. Bank. Nor did Plaintiff Iacovetti give his prior consent, express or otherwise, to Defendant or U.S. Bank to allow Defendant to wiretap his communications with U.S. Bank.

74. Plaintiff Iacovetti has, therefore, had his privacy severely invaded and been exposed to the risks and harmful conditions created by Defendant's violations of WESCA alleged herein.

## **CLASS ALLEGATIONS**

75. Plaintiffs Juarez and Marin seek to represent a class defined as all residents of the State of California who called U.S. Bank from their residence, workplace, or place of business in California and had their conversations with U.S. Bank recorded, monitored, or listened to by Defendant (the " California Class").

76. Plaintiff Shultz seeks to represent a class defined as all residents of the State of Massachusetts who called U.S. Bank from their residence, workplace,

or place of business in Massachusetts and had their conversations with U.S. Bank recorded, monitored, or listened to by Defendant (the "Massachusetts Class").

77. Plaintiff Iacovetti seeks to represent a class defined as all residents of the State of Pennsylvania who called U.S. Bank from their residence, workplace, or place of business in Pennsylvania and had their conversations with U.S. Bank recorded, monitored, or listened to by Defendant (the "Pennsylvania Class") (collectively with the California Class and the Massachusetts Class, the "Classes").

78. The following people are excluded from the Classes: (1) any Judge presiding over this action and members of his or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or their parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

79. **Numerosity:** The number of persons within the Classes is substantial and believed to amount to thousands, if not millions of persons. It is, therefore, impractical to join each member of the Class as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Classes

renders joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from records belonging to Defendant.

80. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class members, include, but are not limited to, the following:

(a) Whether Defendant violated CIPA §§ 631 and 632;

(b) Whether Defendant violated the Massachusetts Wiretap Statute;

(c) Whether Defendant violated WESCA;

(d) Whether Defendant sought or obtained prior consent – express or otherwise – from Plaintiffs and members of the Classes; and

(e) Whether Plaintiffs and members of the Classes are entitled to actual and/or statutory damages for the aforementioned violations.

81. **Typicality:** The claims of the named Plaintiffs are typical of the claims of the Classes because the named Plaintiffs, like all other members of the

Classes, had the content of their communications read, learned, analyzed, and/or examined by Defendant.

82. **Adequate Representation:** Plaintiffs are adequate representatives of the Classes because their interests do not conflict with the interests of the Classes they seek to represent, they have retained competent counsel experienced in prosecuting class actions, and they intend to prosecute this action vigorously. The interests of the Class Members will be fairly and adequately protected by Plaintiffs and their counsel.

83. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment

of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

84. Plaintiffs Marin and Juarez repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

85. Plaintiffs Marin and Juarez bring this claim individually and on behalf of the members of the California Class against Defendant.

86. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978).

87. To establish liability under CIPA § 631(a), Plaintiffs Marin and Juarez need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in

> transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

88. Pega Voice AI and its features is a "machine, instrument, contrivance, or ... other manner" used to engage in the prohibited conduct at issue here.

89. Defendant is a separate legal entity that offers "'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021). Accordingly, Defendant was a third party to any communication between Plaintiffs Marin and Juarez and members of the California Class, on the one hand, and U.S. Bank, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F Supp. 3d 891, 900 (N.D. Cal. 2023); *Turner v. Nuance Communications, Inc.*, 2024 WL 2750017, at *10 (N.D. Cal. May 28, 2024); *Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *6 (W.D. Wash. July 2, 2024).

90. At all relevant times, through Pega Voice AI and its features, Defendant intentionally tapped, electrically or otherwise, the lines of telephone communication between Plaintiffs Marin and Juarez and members of the California Class, on the one hand, and U.S. Bank, on the other hand.

91. At all relevant times, through Pega Voice AI and its features, Defendant willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Plaintiffs Marin and Juarez and members of the California Class, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

92. Plaintiffs Marin and Juarez and members of the California Class did not consent to any of Defendant's actions discussed above. Nor did Plaintiffs Marin and Juarez or members of the California Class consent to Defendant's intentional access, interception, reading, learning, recording, collection, and analysis of communications from Plaintiffs Marin and Juarez and members of the California Class.

93. The violation of CIPA § 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

94. Pursuant to Cal. Penal Code § 637.2, Plaintiffs Marin and Juarez and the California Class Members have been injured by the violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
## Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632(a)

95. Plaintiffs Marin and Juarez repeat the allegations contained in the foregoing paragraphs as if fully set forth herein.

96. Plaintiffs Marin and Juarez bring this claim individually and on behalf of the members of the California Class against Defendant.

97. CIPA § 632(a) prohibits an entity from

> [I]ntentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

98. Pega Voice AI and its features is an "electronic amplifying or recording device."

99. At all relevant times, the communications between Plaintiffs Marin and Juarez and putative California Class Members, on the one hand, and U.S. Bank customer service agents, on the other, were confidential.

100. At all relevant times, Defendant intentionally used Pega Voice AI and its features, to eavesdrop upon and record the confidential communications of Plaintiffs Marin and Juarez and California Class Members, on the one hand, and U.S. Bank customer service agents, on the other.

101. When communicating with U.S. Bank, Plaintiffs Marin and Juarez and California Class Members had an objectively reasonable expectation of privacy. Plaintiffs Marin and Juarez and California Class Members did not reasonably expect that anyone other than U.S. Bank's customer service agents would be on the other end of the call, and that other, third-party entities like Defendant, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs Marin and Juarez and California Class Members. Indeed, Plaintiffs Marin and Juarez and California Class Members each communicated confidential financial information to U.S. Bank customer service agents, which enhances their reasonable expectation of privacy because such sensitive communications should not be disclosed to or intercepted by third parties like Defendant.

102. Plaintiffs Marin and Juarez and California Class Members did not consent to any of Defendant's actions. Nor have Plaintiffs Marin and Juarez and California Class Members consented to Defendant's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiffs Marin and Juarez and California Class Members.

103. The violation of CIPA § 632(a) constitutes an invasion of privacy sufficient to confer Article III standing.

104. Pursuant to Cal. Penal Code § 637.2, Plaintiffs Marin and Juarez and California Class Members have been injured by the violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

**COUNT III**
**Violation Of The Massachusetts Wiretapping Statute**
**(Mass. Gen. Laws ch. 272, § 99)**

105. Plaintiff Shultz brings this claim individually and on behalf of the Massachusetts Class.

106. Plaintiff Shultz incorporates the preceding paragraphs as if fully set forth herein.

107. The Massachusetts Wiretap Statute prohibits the interception, attempted interception, use, or disclosure of any oral or wire communications which violates personal, property, or privacy interests. Mass. Gen. Laws ch. 272, § 99(C).

108. The express legislative purpose of Mass. Gen. Laws ch. 272, § 99's unequivocal ban on secret recordings is to protect Massachusetts citizens' privacy. In fact, the Massachusetts Wiretap Statute's preamble states that secret recording "pose[s] grave dangers to the privacy of all citizens of the commonwealth." Mass. Gen. Laws ch. 272, § 99(A).

109. Any aggrieved person whose oral or wire communications were intercepted, disclosed, or used except as permitted or authorized by the

Massachusetts Wiretap Statute or whose personal or property interests or privacy were violated by means of an interception except as permitted or authorized by the Massachusetts Wiretap Statute shall have a civil cause of action against any person who so intercepts, discloses, or uses such communications or who so violates his personal, property, or privacy interest, and shall be entitled to recover from any such person actual damages but not less than liquidated damages computed at the rate of $100 per day for each day of violation or $1000, whichever is higher; punitive damages; and a reasonable attorney's fee and other litigation disbursements reasonably incurred. Mass. Gen. Laws ch. 272, § 99(Q). 77.

110. "Interception" means to "secretly hear, secretly record, or aid another to secretly hear or secretly record the contents of any wire or oral communication through the use of any intercepting device by any person other than a person given prior authority by all parties to such communication." Mass. Gen. Laws ch. 272, § 99(B)(4).

111. "Contents" when "used with respect to any wire or oral communication, means any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." Mass. Gen. Laws ch. 272, § 99(B)(5).

112. "Intercepting device" means "any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication

other than a hearing aid or similar device which is being used to correct subnormal hearing to normal and other than any telephone or telegraph instrument, equipment, facility, or a component thereof, (a) furnished to a subscriber or user by a communications common carrier in the ordinary course of its business under its tariff and being used by the subscriber or user in the ordinary course of its business; or (b) being used by a communications common carrier in the ordinary course of its business." Mass. Gen. Laws ch. 272, § 99(B)(3).

113. "Wire communication" means "any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception." Mass. Gen. Laws ch. 272, § 99(B)(1) (emphasis added).

114. "Person" means "any individual, partnership, association, joint stock company, trust, or corporation, whether or not any of the foregoing is an officer, agent or employee of the United States, a state, or a political subdivision of a state." Mass. Gen. Laws ch. 272, § 99(B)(13).

115. "Use" includes "willfully us[ing] or attempt[ing] to use the contents of any wire or oral communication, knowing that the information was obtained through interception." Mass. Gen. Laws ch. 272, § 99(C)(3)(b).

116. Defendant is a "person" for purposes of the Massachusetts Wiretap Statute because it is a corporation.

117. AI like that sold by Defendant is an "intercepting device," within the meaning of the Statute. Mass. Gen. Laws ch. 272, § 99(B)(3).

118. Plaintiff Shultz's and Massachusetts Class members' intercepted communications constitute the "contents" of "electronic communication[s]" within the meaning of the Massachusetts Wiretap Statute.

119. Defendant intentionally uses its AI to automatically and secretly intercept U.S. Bank customers' communications with U.S. Bank in real time, thus spying on them.

120. Plaintiff Shultz's and Massachusetts Class members' electronic communications are intercepted contemporaneously with their transmission.

121. Plaintiff Shultz and Massachusetts Class members did not consent to having their communications wiretapped.

122. Defendant's conduct violated Mass. Gen. Laws ch. 272, § 99 and therefore gives rise to a claim under Mass. Gen. Laws ch. 272, § 99(Q).

123. Pursuant to Mass. Gen. Laws ch. 272, § 99(Q), Plaintiff Shultz and the Massachusetts Class members seek (1) actual damages, not less than liquidated damages computed at the rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.

124. Defendant's conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff Shultz and Massachusetts Class members any time they call U.S. Bank with Defendant's AI enabled without their consent. Plaintiff Shultz and Massachusetts Class members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications

## COUNT IV
**Violation Of The Pennsylvania Wiretapping Act**
**(18 Pa. Cons. Stat. § 5701, *et seq.*)**

125. Plaintiff Iacovetti repeats the allegations contained in the paragraphs above as if fully set forth herein.

126. Plaintiff Iacovetti brings this Count individually and on behalf of the members of the Pennsylvania Class.

127. The Pennsylvania Wiretapping Act prohibits: (a) the interception or procurement of another to intercept any wire, electronic, or oral communication; (b) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (c) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication. 18 Pa. Cons. Stat. § 5703.

128. Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

129. At all relevant times, Defendant tracked and intercepted Plaintiff Iacovetti's and Pennsylvania Class Members' communications with U.S. Bank. These communications were intercepted without authorization and consent from Plaintiff Iacovetti and Pennsylvania Class Members.

130. Defendant intended to learn the meaning of the content of U.S. Bank customers' conversations.

131. Plaintiff Iacovetti and Pennsylvania Class Members had a justified expectation under the circumstances that their communications would not be intercepted.

132. Plaintiff Iacovetti and Pennsylvania Class Members were not aware that their communications were being intercepted by Defendant.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a) For an order certifying the Classes under Fed. R. Civ. P. 23, naming Plaintiffs Ruben Juarez and Sean Marin as the representatives of the California Class, Plaintiff Brian Shultz as representative of the Massachusetts Class, and Plaintiff Iacovetti as representative of the Pennsylvania Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d) For statutory damages of $5,000 for each violation of CIPA § 631(a) and 632;

(e) Awarding compensatory damages, including statutory damages where available, to Plaintiffs and Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

(f) For punitive damages, as warranted, in an amount to be determined at trial;

(g) For pre- and post-judgment interest on all amounts awarded;

(h) For an order of restitution and all other forms of equitable monetary relief;

(i) For an order awarding Plaintiffs and the Classes their reasonable attorney's fees and expenses and costs of suit; and

(j) Granting Plaintiffs and the Class Members such further relief as the Court deems appropriate.

## JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury for all issues so triable.

Dated: October 2, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: *_/s/ Yitzchak Kopel_*
Yitzchak Kopel

Yitzchak Kopel (BBO # 716245)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com

*Attorneys for Plaintiffs*